Kirk Pasich (SBN 94242)
KPasich@PasichLLP.com
Christopher T. Pasich (SBN 299191)
CPasich@PasichLLP.com
PASICH LLP
10880 Wilshire Boulevard, Suite 2000
Los Angeles, CA 90024
Telephone: (424) 313-7860
Facsimile: (424) 313-7890

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CACHET FINANCIAL SERVICES, a California corporation, <br><br> Plaintiff, <br><br> vs. <br><br> BERKLEY INSURANCE COMPANY, a Delaware corporation and GREAT AMERICAN INSURANCE COMPANY, an Ohio corporation, <br><br> Defendants. | Case No.: 2:22-cv-01157 <br><br> **COMPLAINT FOR BREACH OF CONTRACT AND TORTIOUS BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Cachet Financial Services ("Cachet") complains of defendants Berkley Insurance Company ("Berkley") and Great American Insurance Company ("Great American") (together, the "Insurers") and alleges as follows:

## NATURE OF THE ACTION

1. This action is for breach of contract arising out of the Insurers' refusal to provide coverage under a Commercial Crime Policy (the "Berkley Policy") and an Excess Follow Form Policy (the "Great American Policy") (together, the "Policies").

---

**COMPLAINT AND DEMAND FOR JURY TRIAL**

2. Cachet had business relationships with MyPayrollHR LLC ("MyPayrollHR") and iGreen Payroll Services Inc. ("iGreen") in which Cachet acted as an Automated Clearing House ("ACH") transactions and related payroll services provider by using its patented Automated Clearing House process to route payments from the clients of MyPayrollHR and iGreen to those clients' employees. These transactions were effectuated using instructions provided to Cachet's system in batch files that included details of the transfers such as payment timing and amount, employer and employee bank account information, and information relating to Cachet's settlement bank account. In late August and early September 2019, and again on October 18, 2019, MyPayrollHR, iGreen, and individuals affiliated with those entities altered, modified, and/or otherwise improperly used and uploaded batch files and the specifications contained therein in contravention to the written agreements between the parties. By way of these alterations, modifications, and other related improper uses, MyPayrollHR and iGreen caused multiple fraudulent transfers that resulted in over $40 million in losses to Cachet.

3. Cachet promptly notified the Insurers of its losses, requesting coverage. However, the Insurers wrongfully and unreasonably denied coverage. By this lawsuit, Cachet seeks damages for the Insurers' breaches, and punitive damages for the Insurers' bad faith.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction under 28 U.S.C. section 1332 based on complete diversity of citizenship between the parties and because the amount in controversy, exclusive of costs and interest, exceeds $75,000.

5. This Court has personal jurisdiction over Berkley because Berkley conducts business in the County of Los Angeles.

6. This Court has personal jurisdiction over Great American because Great American conducts business in the County of Los Angeles.

7. Venue is proper in the Central District of California pursuant to 28

U.S.C. section 1391 because a substantial part of the events or omissions giving rise to Cachet's losses occurred in this District. Berkley and Great American have also marketed, advertised, sold, and maintained insurance policies, and otherwise conducted extensive business, within this district, and the insurance broker is also located in Los Angeles.

## THE PARTIES

8. Cachet is a California corporation with its principal place of business at 175 S. Lake Avenue, Pasadena, California, 91101. Cachet is a subsidiary of Financial Business Group Holdings.

9. Cachet is informed and believes, and on that basis alleges, that Berkley is a Delaware corporation with a principal place of business in Greenwich, Connecticut.

10. Berkley is a member of the W. R. Berkley Corporation family of insurance companies. It sells crime insurance policies under the umbrella of "Berkley Crime, a division of Berkley Financial Specialists, a Berkley Company."[1] Berkley Crime makes various representations on behalf of its member companies, including Berkley, on its collective website for its member companies, in advertising, and in public statements. Cachet is informed and believes, and on that basis alleges, that in making these statements, Berkley Crime is speaking on behalf of its member companies, including Berkley, and is authorized to do so, such that Berkley Crime's statements are the statements of its member companies, including Berkley.

11. Berkley Crime represents to the public, potential insureds, and insureds on its website that it has deep expertise in providing crime insurance and that its insureds can rely on that expertise in buying insurance and in how claims will be handled. For example, Berkley Crime represents:

---

[1] https://www.berkleycrime.com/about-us/our-company/

3
**COMPLAINT AND DEMAND FOR JURY TRIAL**

**Experts focused on your protection. We deliver.**

Berkley Crime is focused exclusively on providing crime related insurance products for commercial organizations, financial institutions and governmental entities. Berkley Crime is a division of Berkley Financial Specialists, a W. R. Berkley company.

**Trusted experts, specialized solutions and high service standards**

Berkley Crime's team of respected industry professionals, with its unique, specialized experience, has in-depth product knowledge in each of our target markets. We combine underwriting and claims expertise with outstanding personalized service to develop and provide the most creative solutions for customers with crime exposures.

Our parent organization, Berkley Financial Specialists is dedicated to providing customized insurance solutions and outstanding personalized service to financial institutions. In addition, it offers crime-related insurance products for a variety of organizations, entities and financial institutions through its Berkley Crime Division.

**Financial strength for your protection**

We know you need a business partner that has a strong financial foundation. Berkley Crime underwrites on behalf of W. R. Berkley Corporation, whose insurance company subsidiaries are rated A+ (Superior) by A.M. Best Company and A+ (Strong) by Standards & Poor's. Founded in 1967, W. R. Berkley Corporation, an

1 insurance holding company that is among the largest
2 commercial lines writers in the United States and
3 operates worldwide in two segments of the property
4 casualty insurance business: Insurance and Reinsurance.[2]

5     12.    Cachet is informed and believes, and on that basis alleges, that defendant Great American is an Ohio corporation with a principal place of business in Cincinnati, Ohio.

    13.    Cachet is informed and believed, and on that basis alleges, that Great American is a member of the Great American Insurance Group of companies ("GAIG"). GAIG makes various representations on behalf of its member companies, including Great American, on its collective website for its member companies, in advertising, and in public statements. Cachet is informed and believes, and on that basis alleges, that in making these statements, GAIG is speaking on behalf of its member companies, including Great American, and is authorized to do so, such that GAIG's statements are the statements of its member companies, including Great American.

    14.    GAIG Crime represents to the public, potential insureds, and insureds on its website that it has deep expertise in providing crime insurance and that its insureds can rely on that expertise in buying insurance and in how claims will be handled. For example, GAIG states on its website:

> **As one of the largest monoline crime insurers in the hemisphere, Great American Insurance Group maintains $50 million in underwriting capacity for private and public businesses, financial institutions and governmental entities** . . . .
>
> Coupled with the financial strength of Great American

---
[2] *Id.*

5
**COMPLAINT AND DEMAND FOR JURY TRIAL**

Insurance Company, our specialization and expertise gives us the ability to offer coverage enhancements beyond standard forms and to intelligently address the unique exposures of any potential Insured.

. . . .

**Service-Oriented, Experienced Underwriters, Delivering Specialty Coverage, Tailored to Your Needs.**

After 25 years of protecting virtually every class of business from crime-related losses, Great American's Fidelity / Crime Division has a depth of experience in both underwriting and claims that is unmatched in the marketplace.[3]

## THE BERKLEY POLICY

15. Berkley issued Commercial Crime Policy No. BCCR-45003631-20 to Financial Business Group Holdings for the policy period of July 1, 2019, to July 1, 2020 (the "Berkley Policy"). A true and correct copy of the Berkley Policy is attached hereto as Exhibit A.

16. The Berkley Policy identifies Financial Business Group Holdings as the Named Insured. The Omnibus Named Insured Endorsement states that "Named Insured" is amended to include "[a]ny entity which is subject to control by you by reason of operation of such entity through voting control or by written contract" and "[a]ny entity which is subject to control by you by reason of an ownership interest in such entity in excess of 50%." Ex. A, Omnibus Named Insured Endorsement. Cachet is a subsidiary of Financial Business Group Holdings and is subject to control by Financial Business Group Holdings by reason of operation of Cachet

---

[3] *See* https://www.greatamericaninsurancegroup.com/for-businesses/division-details/fidelity-crime.

through voting control or by written contract and by reason of an ownership interest in Cachet in excess of 50 percent.

17. The Berkley Policy provides $5,000,000 in insurance for losses from "Forgery Or Alteration." Under the Forgery Or Alteration Insuring Agreement,

> [Berkley] will pay for loss resulting directly from
> "forgery" or alteration of checks, drafts, promissory notes,
> or similar written promises, orders or directions to pay a
> sum certain in "money" that are:
> (1) Made or drawn by or drawn upon you; or
> (2) Made or drawn by one acting as your agent;
> or that are purported to have been so made or drawn.

*Id.,* A. Insuring Agreements § 2.a.

18. Although "alteration" is undefined, the Berkley Policy defines "Forgery" to mean

> the signing of the name of another person or organization
> with intent to deceive; it does not mean a signature which
> consists in whole or in part of one's own name signed with
> or without authority, in any capacity, for any purpose.

*Id.*, F. Definitions, § 11.

19. The Berkley Policy also provides $5,000,000 in insurance for "Computer And Funds Transfer Fraud." The Computer And Funds Transfer Fraud Insuring Agreement, in pertinent part, promises that Berkley will pay for

> (1) Loss resulting directly from a fraudulent:
> (a) Entry of "electronic data" or "computer
> program" into; or
> (b) Change of "electronic data" or "computer
> program" within;
> any "computer system" owned, leased or operated

      by you, provided the fraudulent entry or fraudulent change causes, with regard to Paragraphs 6.a.(1)(a) and 6.a.(1)(b):

        (i) "Money", "securities" or "other property" to be transferred, paid or delivered; or

        (ii) Your account at a "financial institution" to be debited or deleted.

    (2) Loss resulting directly from a "fraudulent instruction" directing a "financial institution" to debit your "transfer account" and to transfer, pay or deliver "money" or "securities" from that account.

*Id.*, A. Insuring Agreements § 6.a.

  20. The Berkley Policy defines "Electronic data" as information, facts, images or sounds stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software) on data storage devices, including hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

*Id.*, F. Definitions, § 6.

  21. The Berkley Policy defines a "Computer Program" as "a set of related electronic instructions, which direct the operation and function of a computer or devices connected to it, which enable the computer or devices to receive, process, store or send 'electronic data'." *Id.*, F. Definitions, § 1.

  22. The Berkley Policy defines a "Fraudulent instruction," in pertinent part as

    (1) A computer, telefacsimile, telephone or other

8
**COMPLAINT AND DEMAND FOR JURY TRIAL**

|||
|---|---|
| | electronic instruction directing a "financial institution" to debit your "transfer account" and to transfer, pay or deliver "money" or "securities" from that "transfer account", which instruction purports to have been issued by you, but which in fact was fraudulently issued by someone else without your knowledge or consent; or |
| (2) | A written instruction (other than those covered under Insuring Agreement **A.2.**) issued to a "financial institution" directing the "financial institution" to debit your "transfer account" and to transfer, pay or deliver "money" or "securities" from that "transfer account", through an electronic funds transfer system at specified times or under specified conditions, which instruction purports to have been issued by you, but which in fact was issued, forged or altered by someone else without your knowledge or consent. |

*Id.*, F. Definitions, § 12.

## THE GREAT AMERICAN POLICY

23. Great American issued Policy No. SAA 3792754 17 00 to "Financial Business Group Holdings" for the policy period of July 1, 2019, to July 1, 2020 (the "Great American Policy"). A true and correct copy of the Great American Policy is attached hereto as Exhibit B. Cachet is an insured under the Great American Policy.

24. The Great American Policy "follows the form" of the Berkley Policy—that is, incorporated by reference to the terms of the Berkley Policy. The Great American Policy states that Great American agrees to pay loss that

    (a) Would have been paid under the [Berkley Policy] but

for the fact that such loss exceeds the limit of liability of [Berkley], and

(b) for which [Berkley] has (have) made payment, and the Insured has collected, the full amount of the expressed limit of [Berkley's] liability.

Ex. B, Excess Follow Form Certificate.

## CACHET'S PATENTED ACH PROCESS

25. Cachet was a national financial services company that provided Automated Clearing House ("ACH") transactions and related payroll services for the payroll industry.

26. Cachet contracted with payroll companies ("remarketers"), including MyPayrollHR and iGreen, to provide ACH transaction services. The ACH process works as follows:

- An employer, who is a client of a remarketer, provided payroll information to the remarketer.
- The remarketer created an ACH batch file. The batch file identifies the following information: (1) the bank account information for the employer; (2) the amount to be transferred by the employer into Cachet's settlement account; (3) the bank account information for the employer's employees who were being paid; (4) the amounts to be deposited from the settlement account to the employees; and (5) a settlement date on which the transaction was to be effectuated. The batch file also included information for Cachet's settlement account, so that the employers' funds could be transferred from their accounts to the Cachet settlement account.
- The batch file was uploaded to Cachet's server for processing.
- Cachet's server confirmed that the batch file was balanced, such

that the amounts to be withdrawn from the employer equaled the amounts to be paid to the employees.

- Cachet's system initiated the transfer of funds from the employer to the settlement account on the settlement date identified in the batch file.
- Cachet's system automatically disbursed funds from the settlement account to the employee bank accounts.

27. After Cachet's system processed a transaction, banks have two business days to reject and return the transaction. If an ACH transaction is rejected and returned, Cachet's bank charged Cachet's return account for the amount that was returned.

## THE MYPAYROLLHR LOSSES

28. MyPayrollHR was a remarketer client of Cachet. MyPayrollHR contracted with many employers to manage their payrolls and utilized Cachet's system to route payments from MyPayrollHR's clients to those clients' employees.

29. Pursuant to two written agreements between the parties, MyPayrollHR agreed: (1) to use Cachet's system solely for payroll-related transactions; (2) not to use Cachet's system in a way that violates United States law; (3) not to allow unauthorized use of Cachet's ACH services; (4) to provide accurate information in the batch file specifications; and (5) to pay Cachet for all credit entries directed by MyPayrollHR that were made by Cachet on MyPayrollHR's behalf.

30. In or about late August and early September 2019, MyPayrollHR and its principal, Michael Mann ("Mann"), in contravention to the agreements between the parties, manipulated and otherwise altered Cachet's batch file specifications to steal over $26 million from Cachet and route these funds to entities controlled by Mann, and to several other entities to which Mann controlled entities were indebted. This occurred by way of two separate sets of transactions. One set comprised $19,199,175.74 in transfers (the "$19 Million"), and another comprised

1 $7,219,341.34 (the "$7 Million") in transfers, for a total of $26,418,517.04.

2   31. The $19 Million transactions were effectuated through a scheme known as ACH kiting. MyPayrollHR and Mann did this by manipulating Cachet's batch files' specifications – the instructions that dictate the direction, timing and flow of funds – to make it appear as if the $19 Million was being debited from accounts of entities controlled by Mann ("Mann Entities") at Pioneer Bank, located in Albany, New York ("Originating Accounts"), to Cachet's settlement account, and that the same amount was then being debited from Cachet's settlement account and credited to accounts of MyPayrollHR, to accounts of other entities owned and controlled by Mann, and to accounts of entities to which Mann controlled entities were indebted ("Receiving Accounts").

  32. In reality, no funds were transferred to Cachet's settlement account because the accounts from which the funds were supposed to be debited were frozen. Nevertheless, the $19 Million was debited from Cachet's settlement account and credited to the Receiving Accounts, which purportedly were also then frozen by the "receiving" banks. As a result, although Cachet disbursed funds from its settlement account to the Receiving Accounts, no money was transferred to Cachet's settlement account. Cachet attempted to reverse the credits to the Receiving Accounts. However, some of the Receiving Accounts were frozen as well. The attempt to reverse the remainder of the credits to the Receiving Accounts was not successful as the returns stated "Corporate Customer Advises Not Authorized." As a result, Cachet credited the $19 million to the Receiving Accounts without receiving $19 million from the Originating Accounts.

  33. In the $7 million set of transactions, Mann and MyPayrollHR altered account information contained in the batch file specifications relating to Cachet's settlement account. As a result, instead of employers' funds crediting Cachet's settlement account, the MyPayrollHR account was credited. Furthermore, the MyPayrollHR account was frozen. Therefore, the debits from the MYPayrollHR

account to credit employees' accounts were rejected and returned. Because Cachet was the ACH processor, Cachet's funds credited the employees' accounts. As a result, Cachet credited the $7 million to employee accounts without receiving the $7 million from employers.

34. In total, Cachet suffered $26,418,517.04 in losses as a result of the MyPayrollHR/Mann transactions (the "MyPayrollHR losses").

## THE iGREEN LOSSES

35. iGreen was a remarketer client of Cachet. iGreen contracted with many employers to manage their payroll, and utilized Cachet's system to route payments from MyPayrollHR's clients to those clients' employees.

36. Pursuant to two written agreements between the parties, iGreen agreed (1) to use Cachet's system solely for payroll-related transactions; (2) not to use Cachet's system in a way that violates United States law; (3) not to allow unauthorized use of Cachet's ACH services; (4) provide accurate information in the batch file specifications; and (5) pay Cachet for all credit entries directed by iGreen that were made by Cachet on iGreen's behalf.

37. On October 18, 2019, in coordination with one of its clients, iGreen uploaded fraudulent batch files to Cachet's server. In contravention to the agreements between the parties, those transactions were not payroll related. On the contrary, the instructions contained within the batch files directed Cachet's system to debit $21,458,361.97 from accounts at Dime Community Bank ("Dime Bank") of four entities (the "Debited Entities") and credit Cachet's settlement account. However, the Debited Entities bank accounts had insufficient funds when the batch files were uploaded. Cachet's settlement account was subsequently debited in the amount of $21,458,361.97, and two non-employee accounts were credited with the transferred funds in a total of six transactions ("Credited Entities"). These funds were then transferred out of Dime Bank resulting in Cachet's inability to reverse these credits. Then, Dime Bank rejected and returned the debits to the Debited

Entities' accounts. As a result, Cachet's settlement account was debited in the amount of $21,458,361.97, but Cachet did not receive any corresponding funds from the Debited Entities' accounts. Cachet has still yet to be repaid for over $14 million in funds. Therefore, Cachet has suffered over $14 million in losses (the "iGreen Losses").

## CACHET'S NOTICE TO AND COOPERATION WITH THE INSURERS

38. Cachet timely notified the Insurers of the MyPayrollHR and iGreen losses.

39. After submitting its proof of loss, Cachet cooperated with the Insurers through their investigation, including by providing detailed proofs of loss and extensive information.

40. The Insurers had a duty under the Policies, the law, and insurance industry custom, practices, and standards, to pay Cachet for the MyPayrollHR and iGreen losses.

41. Except as otherwise excused, all conditions and duties owed under the Policy have been satisfied. Therefore, the Insurers are obligated to provide all benefits and insurance owed under the Policies.

## FIRST CAUSE OF ACTION
### (Breach of Contract against Berkley)

42. Cachet realleges and incorporates by reference paragraphs 1 through 11, 15 through 22, and 25 through 41 above.

43. On November 23, 2021, Berkley denied Cachet's claim for coverage for the iGreen losses. Despite receiving evidence of the modifications and manipulations to the batch file specifications provided to Cachet, and evidence of Cachet's monetary losses as a result, Berkley asserted that no coverage was available for the iGreen losses under the Forgery or Alteration Insuring Agreement because (1) the batch files do not qualify as a covered instrument (2) the batch files were not "made, drawn by, or drawn upon" Cachet, (3) the batch files were not

"altered," (4) the loss did not result directly, and (5) an exclusion for "Indirect Loss" barred coverage. Berkley also contended that the loss did not satisfy the definition of money. Finally, Berkley also asserted no coverage was available under the Computer and Funds Transfer Fraud Insuring Agreement because (1) there was no fraudulent entry or change of electronic data, (2) the loss did not directly result from a fraudulent entry or change of electronic data, and (3) the loss may not satisfy the definition of "money." Berkley likewise asserted that several additional exclusions applied to bar coverage for Cachet's claim.

44. That same day, Berkley also denied Cachet's claim for coverage for the MyPayrollHR losses. As with the iGreen losses, Cachet provided significant evidence of the fraudulent instructions and entries into the batch files associated with the MyPayrollHR losses. Nevertheless, Berkley asserted that no coverage was available under the Forgery or Alteration Insuring Agreement or the Computer and Funds Transfer Fraud Insuring Agreement for substantially identical reasons as it asserted with respect to the iGreen losses.

45. Berkley breached its duties under the Berkley Policy, by, among other things, denying coverage for the losses suffered by Cachet and refusing to pay for any part of those losses.

46. As a direct and proximate result of Berkley's breach of its duties under the Berkley Policy, Cachet is entitled to recover damages in an amount of the applicable policy limits, plus interest thereon.

## SECOND CAUSE OF ACTION

### (Breach of Contract against Great American)

47. Cachet realleges and incorporates by reference paragraphs 1 through 9 and 12 through 41 above.

48. On January 12, 2022, Great American denied Cachet's claims for coverage for the iGreen and MyPayrollHR losses. Great American stated that it agreed with the conclusions and reservations in Berkley's denial letters and

15
COMPLAINT AND DEMAND FOR JURY TRIAL

incorporated those denials by reference. Great American further stated that because coverage was not afforded under the Berkley Policy, the conditions of the Great American Policy were not satisfied.

49. Great American breached its duties under the Great American Policy, by, among other things, denying coverage for the losses suffered by Cachet and refusing to pay for any part of those losses.

50. As a direct and proximate result of Great American's breach of its duties under the Great American Policy, Cachet is entitled to recover damages in an amount of the applicable policy limits, plus interest thereon.

### THIRD CAUSE OF ACTION

### (Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing Against the Insurers)

51. Cachet realleges and incorporates paragraphs 1 through 41, 43 through 46, and 48 through 50 above.

52. Implied in the Policies is a covenant that the Insurers would act in good faith and deal fairly with its insured, that the Insurers would do nothing to interfere with its insured's right to receive the benefits of the Policies, and that the Insurers would give at least the same level of consideration to its insured's interest as it gives their own interests.

53. The Insurers also had a duty under the Policies, the law, and insurance industry custom, practice, and standards, to conduct a prompt and thorough investigation, including an investigation of all bases that might support a claim for coverage, before asserting coverage defenses or denying coverage.

54. Instead of complying with these duties, the Insurers breached their implied covenant of good faith and fair dealing by, among other things:

- Artificially and narrowly interpreting the Policies' provisions;
- Asserting grounds for denial of coverage that it knows are not supported by, and in fact are contrary to, the terms of the

Policies, the law, insurance industry custom, practice, standards, and the facts;

- Failing to fully inquire into possible bases that might support coverage for the claimed losses and that might negate the Insurers' attempts to avoid their duty to pay for these covered losses;

- Ignoring California law and insurance industry standards;

- Giving greater consideration to their own interests than they gave to the interests of their insured; and

- Otherwise acting as alleged above.

55. In breach of the implied covenant of good faith and fair dealing, the Insurers did the things and committed the acts alleged above for the purpose of consciously withholding the rights and benefits due under the Policies, and without considering Cachet's interests at least to the same extent as it did their own interests.

56. The Insurers' acts are inconsistent with Cachet's reasonable expectations, are contrary to established insurance industry custom, practice and standards, are contrary to legal requirements, are contrary to the express terms of the Policies, and constitute bad faith.

57. Pursuant to the holding in *Brandt v. Superior Court*, 37 Cal. 3d 813 (1985), the Insurers are liable for all attorneys' fees and costs that Cachet has reasonably incurred, and continues to be incurred, to obtain the benefits of insurance that have been, and continue to be, wrongfully and in bad faith withheld by the Insurers.

58. As a direct and proximate result of the Insurers' acts, Cachet is entitled to recover damages in an amount in excess of the Court's jurisdictional limits, plus the attorneys' fees that have been incurred, and that continue to be incurred, in its effort to obtain the benefits that the Insurers owe under the Policies, plus interest on these amounts. The amount of Cachet's damages is not yet precisely known but will

be established according to proof. Cachet will seek leave to amend this Complaint to more precisely allege the amount of its damages when the amount is more precisely known.

59. Cachet is informed and believes, and on that basis alleges, that the Insurers, acting through one or more of their directors, officers, or other corporate employees with substantial independent and discretionary authority over significant aspects of its business, performed, authorized, or ratified the bad faith conduct alleged above.

60. The Insurers' conduct is despicable and has been done with a conscious disregard of Cachet's rights, constituting oppression, fraud, or malice. The Insurers engaged in a series of acts designed to deny Cachet the benefits due under the Policies. Specifically, the Insurers, by acting as alleged above, in light of information, facts, and relevant law to the contrary, consciously disregarded Cachet's rights and forced Cachet to incur substantial financial losses, thereby inflicting substantial financial damage on Cachet. The Insurers ignored Cachet's interests and concerns with the requisite intent to injure within the meaning of California Civil Code section 3294. Therefore, Cachet is entitled to recover punitive damages from the Insurers in an amount sufficient to punish and make examples of the Insurers and to deter similar conduct in the future.

## **PRAYER FOR RELIEF**

WHEREFORE, Cachet prays for relief as follows:

### **ON THE FIRST AND SECOND CAUSES OF ACTION**

1. For damages according to proof at the time of trial, plus interest;

### **ON THE THIRD CAUSE OF ACTION**

2. For damages according to proof at the time of trial, including the reasonable attorneys' fees and costs incurred in obtaining the benefits due under the Policies, plus interest;

3. For punitive damages in an amount to be determined at trial;

## ON ALL CAUSES OF ACTION

4. For costs of suit herein; and

5. For such other, further, and/or different relief as may be deemed just and proper.

DATED: February 19, 2022     PASICH LLP

By: */s/ Christopher Pasich*
Christopher Pasich
Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff Cachet Financial Services hereby demands a trial by jury in this action.

DATED: February 19, 2022  PASICH LLP

By: /s/ Christopher Pasich
Christopher Pasich

Attorneys for Plaintiff