# EXHIBIT "1"

1  Kirk Pasich (SBN 94242)
   KPasich@PasichLLP.com
2  Christopher T. Pasich (SBN 299191)
   CPasich@PasichLLP.com
3  PASICH LLP
   10880 Wilshire Boulevard, Suite 2000
4  Los Angeles, CA 90024
   Telephone: (424) 313-7860
5  Facsimile: (424) 313-7890

6  Attorneys for Plaintiff

7

8

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11

12 | CACHET FINANCIAL SERVICES, a        | Case No.:  2:22-cv-01157
   | California corporation,

13 |                                      | **COMPLAINT FOR BREACH OF
   |             Plaintiff,               | CONTRACT AND TORTIOUS
14 |                                      | BREACH OF THE IMPLIED
   |     vs.                              | COVENANT OF GOOD FAITH
15 |                                      | AND FAIR DEALING**
   | BERKLEY INSURANCE COMPANY,
16 | a Delaware corporation and GREAT     | **DEMAND FOR JURY TRIAL**
   | AMERICAN INSURANCE
17 | COMPANY, an Ohio corporation,
18 |             Defendants.
19

20

21        Plaintiff Cachet Financial Services ("Cachet") complains of defendants

22 Berkley Insurance Company ("Berkley") and Great American Insurance Company

23 ("Great American") (together, the "Insurers") and alleges as follows:

24                    **NATURE OF THE ACTION**

25        1.    This action is for breach of contract arising out of the Insurers' refusal

26 to provide coverage under a Commercial Crime Policy (the "Berkley Policy") and

27 an Excess Follow Form Policy (the "Great American Policy") (together, the

28 "Policies").

---

2.      Cachet had business relationships with MyPayrollHR LLC ("MyPayrollHR") and iGreen Payroll Services Inc. ("iGreen") in which Cachet acted as an Automated Clearing House ("ACH") transactions and related payroll services provider by using its patented Automated Clearing House process to route payments from the clients of MyPayrollHR and iGreen to those clients' employees. These transactions were effectuated using instructions provided to Cachet's system in batch files that included details of the transfers such as payment timing and amount, employer and employee bank account information, and information relating to Cachet's settlement bank account.  In late August and early September 2019, and again on October 18, 2019, MyPayrollHR, iGreen, and individuals affiliated with those entities altered, modified, and/or otherwise improperly used and uploaded batch files and the specifications contained therein in contravention to the written agreements between the parties.  By way of these alterations, modifications, and other related improper uses, MyPayrollHR and iGreen caused multiple fraudulent transfers that resulted in over $40 million in losses to Cachet.

3.      Cachet promptly notified the Insurers of its losses, requesting coverage. However, the Insurers wrongfully and unreasonably denied coverage.  By this lawsuit, Cachet seeks damages for the Insurers' breaches, and punitive damages for the Insurers' bad faith.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction under 28 U.S.C. section 1332 based on complete diversity of citizenship between the parties and because the amount in controversy, exclusive of costs and interest, exceeds $75,000.

5.      This Court has personal jurisdiction over Berkley because Berkley conducts business in the County of Los Angeles.

6.      This Court has personal jurisdiction over Great American because Great American conducts business in the County of Los Angeles.

7.      Venue is proper in the Central District of California pursuant to 28

2

1   U.S.C. section 1391 because a substantial part of the events or omissions giving rise

2   to Cachet's losses occurred in this District.  Berkley and Great American have also

3   marketed, advertised, sold, and maintained insurance policies, and otherwise

4   conducted extensive business, within this district, and the insurance broker is also

5   located in Los Angeles.

6                                **THE PARTIES**

7           8.      Cachet is a California corporation with its principal place of business at

8   175 S. Lake Avenue, Pasadena, California, 91101.  Cachet is a subsidiary of

9   Financial Business Group Holdings.

10          9.      Cachet is informed and believes, and on that basis alleges, that Berkley

11  is a Delaware corporation with a principal place of business in Greenwich,

12  Connecticut.

13          10.     Berkley is a member of the W. R. Berkley Corporation family of

14  insurance companies.  It sells crime insurance policies under the umbrella of

15  "Berkley Crime, a division of Berkley Financial Specialists, a Berkley Company."[1]

16  Berkley Crime makes various representations on behalf of its member companies,

17  including Berkley, on its collective website for its member companies, in

18  advertising, and in public statements.  Cachet is informed and believes, and on that

19  basis alleges, that in making these statements, Berkley Crime is speaking on behalf

20  of its member companies, including Berkley, and is authorized to do so, such that

21  Berkley Crime's statements are the statements of its member companies, including

22  Berkley.

23          11.     Berkley Crime represents to the public, potential insureds, and insureds

24  on its website that it has deep expertise in providing crime insurance and that its

25  insureds can rely on that expertise in buying insurance and in how claims will be

26  handled.  For example, Berkley Crime represents:

27  _____

28  [1] https://www.berkleycrime.com/about-us/our-company/

                        **COMPLAINT AND DEMAND FOR JURY TRIAL**

1  **Experts focused on your protection. We deliver.**

2  Berkley Crime is focused exclusively on providing crime

3  related insurance products for commercial organizations,

4  financial institutions and governmental entities. Berkley

5  Crime is a division of Berkley Financial Specialists, a W.

6  R. Berkley company.

7  **Trusted experts, specialized solutions and high service**

8  **standards**

9  Berkley Crime's team of respected industry

10  professionals, with its unique, specialized experience, has

11  in-depth product knowledge in each of our target

12  markets. We combine underwriting and claims expertise

13  with outstanding personalized service to develop and

14  provide the most creative solutions for customers with

15  crime exposures.

16  Our parent organization, Berkley Financial Specialists is

17  dedicated to providing customized insurance solutions

18  and outstanding personalized service to financial

19  institutions. In addition, it offers crime-related insurance

20  products for a variety of organizations, entities and

21  financial institutions through its Berkley Crime Division.

22  **Financial strength for your protection**

23  We know you need a business partner that has a strong

24  financial foundation. Berkley Crime underwrites on

25  behalf of W. R. Berkley Corporation, whose insurance

26  company subsidiaries are rated A+ (Superior) by A.M.

27  Best Company and A+ (Strong) by Standards & Poor's.

28  Founded in 1967, W. R. Berkley Corporation, an

4

1    insurance holding company that is among the largest

2    commercial lines writers in the United States and

3    operates worldwide in two segments of the property

4    casualty insurance business: Insurance and Reinsurance.[2]

5         12.    Cachet is informed and believes, and on that basis alleges, that

6    defendant Great American is an Ohio corporation with a principal place of business

7    in Cincinnati, Ohio.

8         13.    Cachet is informed and believed, and on that basis alleges, that Great

9    American is a member of the Great American Insurance Group of companies

10   ("GAIG").  GAIG makes various representations on behalf of its member

11   companies, including Great American, on its collective website for its member

12   companies, in advertising, and in public statements.  Cachet is informed and

13   believes, and on that basis alleges, that in making these statements, GAIG is

14   speaking on behalf of its member companies, including Great American, and is

15   authorized to do so, such that GAIG's statements are the statements of its member

16   companies, including Great American.

17        14.    GAIG Crime represents to the public, potential insureds, and insureds

18   on its website that it has deep expertise in providing crime insurance and that its

19   insureds can rely on that expertise in buying insurance and in how claims will be

20   handled.  For example, GAIG states on its website:

21        **As one of the largest monoline crime insurers in the**

22        **hemisphere, Great American Insurance Group**

23        **maintains $50 million in underwriting capacity for**

24        **private and public businesses, financial institutions**

25        **and governmental entities . . . .**

26        Coupled with the financial strength of Great American

27

28
_____
[2] *Id.*

COMPLAINT AND DEMAND FOR JURY TRIAL

PASICH

PASICH

1           Insurance Company, our specialization and expertise

2           gives us the ability to offer coverage enhancements

3           beyond standard forms and to intelligently address the

4           unique exposures of any potential Insured.

5           . . . .

6           **Service-Oriented, Experienced Underwriters,**

7           **Delivering Specialty Coverage, Tailored to Your**

8           **Needs.**

9           After 25 years of protecting virtually every class of

10         business from crime-related losses, Great American's

11         Fidelity / Crime Division has a depth of experience in

12         both underwriting and claims that is unmatched in the

13         marketplace.[3]

14                    **THE BERKLEY POLICY**

15       15.    Berkley issued Commercial Crime Policy No. BCCR-45003631-20 to

16 Financial Business Group Holdings for the policy period of July 1, 2019, to July 1,

17 2020 (the "Berkley Policy"). A true and correct copy of the Berkley Policy is

18 attached hereto as Exhibit A.

19       16.    The Berkley Policy identifies Financial Business Group Holdings as

20 the Named Insured. The Omnibus Named Insured Endorsement states that "Named

21 Insured" is amended to include "[a]ny entity which is subject to control by you by

22 reason of operation of such entity through voting control or by written contract" and

23 "[a]ny entity which is subject to control by you by reason of an ownership interest in

24 such entity in excess of 50%." Ex. A, Omnibus Named Insured Endorsement.

25 Cachet is a subsidiary of Financial Business Group Holdings and is subject to

26 control by Financial Business Group Holdings by reason of operation of Cachet

27

28    [3] *See* https://www.greatamericaninsurancegroup.com/for-businesses/division-details/fidelity-crime.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1  through voting control or by written contract and by reason of an ownership interest
2  in Cachet in excess of 50 percent.

3       17.    The Berkley Policy provides $5,000,000 in insurance for losses from
4  "Forgery Or Alteration."  Under the Forgery Or Alteration Insuring Agreement,

5          [Berkley] will pay for loss resulting directly from
6          "forgery" or alteration of checks, drafts, promissory notes,
7          or similar written promises, orders or directions to pay a
8          sum certain in "money" that are:
9          (1) Made or drawn by or drawn upon you; or
10         (2) Made or drawn by one acting as your agent;
11         or that are purported to have been so made or drawn.
12 *Id.,* A. Insuring Agreements § 2.a.

13      18.    Although "alteration" is undefined, the Berkley Policy defines
14 "Forgery" to mean

15         the signing of the name of another person or organization
16         with intent to deceive; it does not mean a signature which
17         consists in whole or in part of one's own name signed with
18         or without authority, in any capacity, for any purpose.
19 *Id.,* F. Definitions, § 11.

20      19.    The Berkley Policy also provides $5,000,000 in insurance for
21 "Computer And Funds Transfer Fraud."  The Computer And Funds Transfer Fraud
22 Insuring Agreement, in pertinent part, promises that Berkley will pay for

23         (1)    Loss resulting directly from a fraudulent:
24            (a) Entry of "electronic data" or "computer
25            program" into; or
26            (b) Change of "electronic data" or "computer
27            program" within;
28         any "computer system" owned, leased or operated

PASICH

7

PASICH

1               by you, provided the fraudulent entry or fraudulent

2               change causes, with regard to Paragraphs 6.a.(1)(a)

3               and 6.a.(1)(b):

4                           (i) "Money", "securities" or "other property"

5                           to be transferred, paid or delivered; or

6                           (ii) Your account at a "financial institution"

7                           to be debited or deleted.

8          (2)       Loss resulting directly from a "fraudulent

9               instruction" directing a "financial institution" to

10              debit your "transfer account" and to transfer, pay or

11              deliver "money" or "securities" from that account.

12   *Id.*, A. Insuring Agreements § 6.a.

13        20.    The Berkley Policy defines "Electronic data" as

14              information, facts, images or sounds stored as or on,

15              created or used on, or transmitted to or from computer

16              software (including systems and applications software) on

17              data storage devices, including hard or floppy disks, CD-

18              ROMs, tapes, drives, cells, data processing devices or any

19              other media which are used with electronically controlled

20              equipment.

21   *Id.*, F. Definitions, § 6.

22        21.    The Berkley Policy defines a "Computer Program" as "a set of related

23   electronic instructions, which direct the operation and function of a computer or

24   devices connected to it, which enable the computer or devices to receive, process,

25   store or send 'electronic data'." *Id.*, F. Definitions, § 1.

26        22.    The Berkley Policy defines a "Fraudulent instruction," in pertinent part

27   as

28              (1)    A computer, telefacsimile, telephone or other

8

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Case 2:22-cv-01157-SPG-JEM   Document 23-1   Filed 11/08/22   Page 10 of 21   Page ID
Case 2:22-cv-01157   Document 1   Filed 02/19/22   Page 9 of 20   Page ID #:9
#:276

1    electronic instruction directing a "financial

2    institution" to debit your "transfer account" and to

3    transfer, pay or deliver "money" or "securities"

4    from that "transfer account", which instruction

5    purports to have been issued by you, but which in

6    fact was fraudulently issued by someone else

7    without your knowledge or consent; or

8    (2)   A written instruction (other than those covered

9    under Insuring Agreement **A.2.**) issued to a

10    "financial institution" directing the "financial

11    institution" to debit your "transfer account" and to

12    transfer, pay or deliver "money" or "securities"

13    from that "transfer account", through an electronic

14    funds transfer system at specified times or under

15    specified conditions, which instruction purports to

16    have been issued by you, but which in fact was

17    issued, forged or altered by someone else without

18    your knowledge or consent.

19    *Id.*, F. Definitions, § 12.

20    ## THE GREAT AMERICAN POLICY

21    23.    Great American issued Policy No. SAA 3792754 17 00 to "Financial

22    Business Group Holdings" for the policy period of July 1, 2019, to July 1, 2020 (the

23    "Great American Policy"). A true and correct copy of the Great American Policy is

24    attached hereto as Exhibit B. Cachet is an insured under the Great American Policy.

25    24.    The Great American Policy "follows the form" of the Berkley Policy—

26    that is, incorporated by reference to the terms of the Berkley Policy. The Great

27    American Policy states that Great American agrees to pay loss that

28    (a) Would have been paid under the [Berkley Policy] but

9

**COMPLAINT AND DEMAND FOR JURY TRIAL**

PASICH

Case 2:22-cv-01157-SPG-JEM   Document 23-1   Filed 11/08/22   Page 11 of 21   Page ID
#:276
Case 2:22-cv-01157   Document 1   Filed 02/19/22   Page 10 of 20   Page ID #:10

1    for the fact that such loss exceeds the limit of liability of

2    [Berkley], and

3    (b) for which [Berkley] has (have) made payment, and the

4    Insured has collected, the full amount of the expressed

5    limit of [Berkley's] liability.

6  Ex. B, Excess Follow Form Certificate.

7              **CACHET'S PATENTED ACH PROCESS**

8      25.    Cachet was a national financial services company that provided

9  Automated Clearing House ("ACH") transactions and related payroll services for

10  the payroll industry.

11     26.    Cachet contracted with payroll companies ("remarketers"), including

12  MyPayrollHR and iGreen, to provide ACH transaction services.  The ACH process

13  works as follows:

14        •    An employer, who is a client of a remarketer, provided payroll

15             information to the remarketer.

16        •    The remarketer created an ACH batch file.  The batch file

17             identifies the following information: (1) the bank account

18             information for the employer; (2) the amount to be transferred by

19             the employer into Cachet's settlement account; (3) the bank

20             account information for the employer's employees who were

21             being paid; (4) the amounts to be deposited from the settlement

22             account to the employees; and (5) a settlement date on which the

23             transaction was to be effectuated.  The batch file also included

24             information for Cachet's settlement account, so that the

25             employers' funds could be transferred from their accounts to the

26             Cachet settlement account.

27        •    The batch file was uploaded to Cachet's server for processing.

28        •    Cachet's server confirmed that the batch file was balanced, such

10

PASICH

Case 2:22-cv-01157-SPG-JEM   Document 23-1   Filed 11/08/22   Page 12 of 21   Page ID
#:272
Case 2:22-cv-01157   Document 1   Filed 02/19/22   Page 11 of 20   Page ID #:11

1    that the amounts to be withdrawn from the employer equaled the
2    amounts to be paid to the employees.

3    •    Cachet's system initiated the transfer of funds from the employer
4         to the settlement account on the settlement date identified in the
5         batch file.

6    •    Cachet's system automatically disbursed funds from the
7         settlement account to the employee bank accounts.

8    27.    After Cachet's system processed a transaction, banks have two business
9    days to reject and return the transaction.  If an ACH transaction is rejected and
10   returned, Cachet's bank charged Cachet's return account for the amount that was
11   returned.

12                    **THE MYPAYROLLHR LOSSES**

13   28.    MyPayrollHR was a remarketer client of Cachet.  MyPayrollHR
14   contracted with many employers to manage their payrolls and utilized Cachet's
15   system to route payments from MyPayrollHR's clients to those clients' employees.

16   29.    Pursuant to two written agreements between the parties, MyPayrollHR
17   agreed: (1) to use Cachet's system solely for payroll-related transactions; (2) not to
18   use Cachet's system in a way that violates United States law; (3) not to allow
19   unauthorized use of Cachet's ACH services; (4) to provide accurate information in
20   the batch file specifications; and (5) to pay Cachet for all credit entries directed by
21   MyPayrollHR that were made by Cachet on MyPayrollHR's behalf.

22   30.    In or about late August and early September 2019, MyPayrollHR and
23   its principal, Michael Mann ("Mann"), in contravention to the agreements between
24   the parties, manipulated and otherwise altered Cachet's batch file specifications to
25   steal over $26 million from Cachet and route these funds to entities controlled by
26   Mann, and to several other entities to which Mann controlled entities were indebted.
27   This occurred by way of two separate sets of transactions. One set comprised
28   $19,199,175.74 in transfers (the "$19 Million"), and another comprised

                                      11
                    **COMPLAINT AND DEMAND FOR JURY TRIAL**

Case 2:22-cv-01157-SPG-JEM   Document 23-1   Filed 11/08/22   Page 13 of 21   Page ID
#:278
Case 2:22-cv-01157   Document 1   Filed 02/19/22   Page 12 of 20   Page ID #:12

1  $7,219,341.34 (the "$7 Million") in transfers, for a total of $26,418,517.04.

2      31.    The $19 Million transactions were effectuated through a scheme known

3  as ACH kiting.  MyPayrollHR and Mann did this by manipulating Cachet's batch

4  files' specifications – the instructions that dictate the direction, timing and flow of

5  funds – to make it appear as if the $19 Million was being debited from accounts of

6  entities controlled by Mann ("Mann Entities") at Pioneer Bank, located in Albany,

7  New York ("Originating Accounts"), to Cachet's settlement account, and that the

8  same amount was then being debited from Cachet's settlement account and credited

9  to accounts of MyPayrollHR, to accounts of other entities owned and controlled by

10 Mann, and to accounts of entities to which Mann controlled entities were indebted

11 ("Receiving Accounts").

12     32.    In reality, no funds were transferred to Cachet's settlement account

13 because the accounts from which the funds were supposed to be debited were

14 frozen.  Nevertheless, the $19 Million was debited from Cachet's settlement account

15 and credited to the Receiving Accounts, which purportedly were also then frozen by

16 the "receiving" banks.  As a result, although Cachet disbursed funds from its

17 settlement account to the Receiving Accounts, no money was transferred to Cachet's

18 settlement account.  Cachet attempted to reverse the credits to the Receiving

19 Accounts.  However, some of the Receiving Accounts were frozen as well.  The

20 attempt to reverse the remainder of the credits to the Receiving Accounts was not

21 successful as the returns stated "Corporate Customer Advises Not Authorized."  As

22 a result, Cachet credited the $19 million to the Receiving Accounts without

23 receiving $19 million from the Originating Accounts.

24     33.    In the $7 million set of transactions, Mann and MyPayrollHR altered

25 account information contained in the batch file specifications relating to Cachet's

26 settlement account.  As a result, instead of employers' funds crediting Cachet's

27 settlement account, the MyPayrollHR account was credited.  Furthermore, the

28 MyPayrollHR account was frozen.  Therefore, the debits from the MYPayrollHR

12

1    account to credit employees' accounts were rejected and returned. Because Cachet
2    was the ACH processor, Cachet's funds credited the employees' accounts. As a
3    result, Cachet credited the $7 million to employee accounts without receiving the $7
4    million from employers.

5           34.    In total, Cachet suffered $26,418,517.04 in losses as a result of the
6    MyPayrollHR/Mann transactions (the "MyPayrollHR losses").

7                               **THE iGREEN LOSSES**

8           35.    iGreen was a remarketer client of Cachet. iGreen contracted with many
9    employers to manage their payroll, and utilized Cachet's system to route payments
10   from MyPayrollHR's clients to those clients' employees.

11          36.    Pursuant to two written agreements between the parties, iGreen agreed
12   (1) to use Cachet's system solely for payroll-related transactions; (2) not to use
13   Cachet's system in a way that violates United States law; (3) not to allow
14   unauthorized use of Cachet's ACH services; (4) provide accurate information in the
15   batch file specifications; and (5) pay Cachet for all credit entries directed by iGreen
16   that were made by Cachet on iGreen's behalf.

17          37.    On October 18, 2019, in coordination with one of its clients, iGreen
18   uploaded fraudulent batch files to Cachet's server. In contravention to the
19   agreements between the parties, those transactions were not payroll related. On the
20   contrary, the instructions contained within the batch files directed Cachet's system
21   to debit $21,458,361.97 from accounts at Dime Community Bank ("Dime Bank") of
22   four entities (the "Debited Entities") and credit Cachet's settlement account.
23   However, the Debited Entities bank accounts had insufficient funds when the batch
24   files were uploaded. Cachet's settlement account was subsequently debited in the
25   amount of $21,458,361.97, and two non-employee accounts were credited with the
26   transferred funds in a total of six transactions ("Credited Entities"). These funds
27   were then transferred out of Dime Bank resulting in Cachet's inability to reverse
28   these credits. Then, Dime Bank rejected and returned the debits to the Debited

**COMPLAINT AND DEMAND FOR JURY TRIAL**

PASICH

PASICH.

1  Entities' accounts.  As a result, Cachet's settlement account was debited in the

2  amount of $21,458,361.97, but Cachet did not receive any corresponding funds from

3  the Debited Entities' accounts.  Cachet has still yet to be repaid for over $14 million

4  in funds.  Therefore, Cachet has suffered over $14 million in losses (the "iGreen

5  Losses").

6  **CACHET'S NOTICE TO AND COOPERATION WITH THE INSURERS**

7        38.   Cachet timely notified the Insurers of the MyPayrollHR and iGreen

8  losses.

9        39.   After submitting its proof of loss, Cachet cooperated with the Insurers

10  through their investigation, including by providing detailed proofs of loss and

11  extensive information.

12        40.   The Insurers had a duty under the Policies, the law, and insurance

13  industry custom, practices, and standards, to pay Cachet for the MyPayrollHR and

14  iGreen losses.

15        41.   Except as otherwise excused, all conditions and duties owed under the

16  Policy have been satisfied.  Therefore, the Insurers are obligated to provide all

17  benefits and insurance owed under the Policies.

18  **FIRST CAUSE OF ACTION**

19  **(Breach of Contract against Berkley)**

20        42.   Cachet realleges and incorporates by reference paragraphs 1 through

21  11, 15 through 22, and 25 through 41 above.

22        43.   On November 23, 2021, Berkley denied Cachet's claim for coverage

23  for the iGreen losses.  Despite receiving evidence of the modifications and

24  manipulations to the batch file specifications provided to Cachet, and evidence of

25  Cachet's monetary losses as a result, Berkley asserted that no coverage was

26  available for the iGreen losses under the Forgery or Alteration Insuring Agreement

27  because (1)  the batch files do not qualify as a covered instrument (2) the batch files

28  were not "made, drawn by, or drawn upon" Cachet, (3) the batch files were not

14

1 | "altered," (4) the loss did not result directly, and (5) an exclusion for "Indirect Loss"
2 | barred coverage.  Berkley also contended that the loss did not satisfy the definition
3 | of money.  Finally, Berkley also asserted no coverage was available under the
4 | Computer and Funds Transfer Fraud Insuring Agreement because (1) there was no
5 | fraudulent entry or change of electronic data, (2) the loss did not directly result from
6 | a fraudulent entry or change of electronic data, and (3) the loss may not satisfy the
7 | definition of "money."  Berkley likewise asserted that several additional exclusions
8 | applied to bar coverage for Cachet's claim.

9 |    44. That same day, Berkley also denied Cachet's claim for coverage for the
10 | MyPayrollHR losses.  As with the iGreen losses, Cachet provided significant
11 | evidence of the fraudulent instructions and entries into the batch files associated
12 | with the MyPayrollHR losses.  Nevertheless, Berkley asserted that no coverage was
13 | available under the Forgery or Alteration Insuring Agreement or the Computer and
14 | Funds Transfer Fraud Insuring Agreement for substantially identical reasons as it
15 | asserted with respect to the iGreen losses.

16 |    45. Berkley breached its duties under the Berkley Policy, by, among other
17 | things, denying coverage for the losses suffered by Cachet and refusing to pay for
18 | any part of those losses.

19 |    46. As a direct and proximate result of Berkley's breach of its duties under
20 | the Berkley Policy, Cachet is entitled to recover damages in an amount of the
21 | applicable policy limits, plus interest thereon.

22 | **SECOND CAUSE OF ACTION**
23 | **(Breach of Contract against Great American)**

24 |    47. Cachet realleges and incorporates by reference paragraphs 1 through 9
25 | and 12 through 41 above.

26 |    48. On January 12, 2022, Great American denied Cachet's claims for
27 | coverage for the iGreen and MyPayrollHR losses.  Great American stated that it
28 | agreed with the conclusions and reservations in Berkley's denial letters and

PASICH

1  incorporated those denials by reference.  Great American further stated that because

2  coverage was not afforded under the Berkley Policy, the conditions of the Great

3  American Policy were not satisfied.

4      49.    Great American breached its duties under the Great American Policy,

5  by, among other things, denying coverage for the losses suffered by Cachet and

6  refusing to pay for any part of those losses.

7      50.    As a direct and proximate result of Great American's breach of its

8  duties under the Great American Policy, Cachet is entitled to recover damages in an

9  amount of the applicable policy limits, plus interest thereon.

10                    **THIRD CAUSE OF ACTION**

11         **(Tortious Breach of the Implied Covenant of Good Faith**

12              **and Fair Dealing Against the Insurers)**

13     51.    Cachet realleges and incorporates paragraphs 1 through 41, 43 through

14  46, and 48 through 50 above.

15     52.    Implied in the Policies is a covenant that the Insurers would act in good

16  faith and deal fairly with its insured, that the Insurers would do nothing to interfere

17  with its insured's right to receive the benefits of the Policies, and that the Insurers

18  would give at least the same level of consideration to its insured's interest as it gives

19  their own interests.

20     53.    The Insurers also had a duty under the Policies, the law, and insurance

21  industry custom, practice, and standards, to conduct a prompt and thorough

22  investigation, including an investigation of all bases that might support a claim for

23  coverage, before asserting coverage defenses or denying coverage.

24     54.    Instead of complying with these duties, the Insurers breached their

25  implied covenant of good faith and fair dealing by, among other things:

26         •    Artificially and narrowly interpreting the Policies' provisions;

27         •    Asserting grounds for denial of coverage that it knows are not

28              supported by, and in fact are contrary to, the terms of the

                                    16

PASICH

Policies, the law, insurance industry custom, practice, standards, and the facts;

• Failing to fully inquire into possible bases that might support coverage for the claimed losses and that might negate the Insurers' attempts to avoid their duty to pay for these covered losses;

• Ignoring California law and insurance industry standards;

• Giving greater consideration to their own interests than they gave to the interests of their insured; and

• Otherwise acting as alleged above.

55.    In breach of the implied covenant of good faith and fair dealing, the Insurers did the things and committed the acts alleged above for the purpose of consciously withholding the rights and benefits due under the Policies, and without considering Cachet's interests at least to the same extent as it did their own interests.

56.    The Insurers' acts are inconsistent with Cachet's reasonable expectations, are contrary to established insurance industry custom, practice and standards, are contrary to legal requirements, are contrary to the express terms of the Policies, and constitute bad faith.

57.    Pursuant to the holding in *Brandt v. Superior Court*, 37 Cal. 3d 813 (1985), the Insurers are liable for all attorneys' fees and costs that Cachet has reasonably incurred, and continues to be incurred, to obtain the benefits of insurance that have been, and continue to be, wrongfully and in bad faith withheld by the Insurers.

58.    As a direct and proximate result of the Insurers' acts, Cachet is entitled to recover damages in an amount in excess of the Court's jurisdictional limits, plus the attorneys' fees that have been incurred, and that continue to be incurred, in its effort to obtain the benefits that the Insurers owe under the Policies, plus interest on these amounts. The amount of Cachet's damages is not yet precisely known but will

17

PASICH

Case 2:22-cv-01157-SPG-JEM   Document 23-1   Filed 11/08/22   Page 19 of 21   Page ID
#:284
Case 2:22-cv-01157   Document 1   Filed 02/19/22   Page 18 of 20   Page ID #:18

1  be established according to proof.  Cachet will seek leave to amend this Complaint
2  to more precisely allege the amount of its damages when the amount is more
3  precisely known.

4       59.    Cachet is informed and believes, and on that basis alleges, that the
5  Insurers, acting through one or more of their directors, officers, or other corporate
6  employees with substantial independent and discretionary authority over significant
7  aspects of its business, performed, authorized, or ratified the bad faith conduct
8  alleged above.

9       60.    The Insurers' conduct is despicable and has been done with a conscious
10 disregard of Cachet's rights, constituting oppression, fraud, or malice.  The Insurers
11 engaged in a series of acts designed to deny Cachet the benefits due under the
12 Policies.  Specifically, the Insurers, by acting as alleged above, in light of
13 information, facts, and relevant law to the contrary, consciously disregarded
14 Cachet's rights and forced Cachet to incur substantial financial losses, thereby
15 inflicting substantial financial damage on Cachet.  The Insurers ignored Cachet's
16 interests and concerns with the requisite intent to injure within the meaning of
17 California Civil Code section 3294.  Therefore, Cachet is entitled to recover punitive
18 damages from the Insurers in an amount sufficient to punish and make examples of
19 the Insurers and to deter similar conduct in the future.

20                    **PRAYER FOR RELIEF**
21      WHEREFORE, Cachet prays for relief as follows:
22           **ON THE FIRST AND SECOND CAUSES OF ACTION**
23      1.    For damages according to proof at the time of trial, plus interest;
24               **ON THE THIRD CAUSE OF ACTION**
25      2.    For damages according to proof at the time of trial, including the
26 reasonable attorneys' fees and costs incurred in obtaining the benefits due under the
27 Policies, plus interest;
28      3.    For punitive damages in an amount to be determined at trial;

## ON ALL CAUSES OF ACTION

4.      For costs of suit herein; and

5.      For such other, further, and/or different relief as may be deemed just and proper.


DATED:  February 19, 2022           PASICH LLP

                                    By:  */s/ Christopher Pasich*
                                         Christopher Pasich
                                         Attorneys for Plaintiff

PASICH.

COMPLAINT AND DEMAND FOR JURY TRIAL

## DEMAND FOR JURY TRIAL

Plaintiff Cachet Financial Services hereby demands a trial by jury in this action.

DATED:  February 19, 2022          PASICH LLP

                                   By:  */s/ Christopher Pasich*
                                        Christopher Pasich

                                        Attorneys for Plaintiff

---

20

**COMPLAINT AND DEMAND FOR JURY TRIAL**